## WICKS v. FRIENDLY.
### Patent Appeal Nos. 2895–2898.

Court of Customs and Patent Appeals.
Feb. 8, 1932.

Walter A. Scott and Chas. M. Candy, both of Chicago, Ill., for appellant.

George E. Mueller, of Chicago, Ill., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

These appeals from the respective decisions of the Board of Appeals of the United States Patent Office involve count 2 of Interference No. 49,496; counts 1, 2, 4, to 6, inclusive, and 11, 12, 15, and 16 inclusive of Interference No. 51,168; counts 4 to 7, inclusive, of Interference No. 53,227; and counts 1 to 6, inclusive (being all the counts), of Interference No. 57,619.

Interference No. 49,496 was declared between a patent, No. 1,404,416, granted January 24, 1922, to Wicks upon an application filed March 4, 1918, and Friendly's application Serial No. 192,713, filed September 22, 1917. The single count of this interference reads: "2. In a telephone system, an operator's position, a source of signaling current, means controlled by an operator for establishing a connection to a called line and for automatically applying said signaling current thereto, said current being automatically cut off by the response of the called subscriber, a relay, a source of alternating current, means for preventing the release of the connection upon the subsequent hanging up of the receiver at the called station and for preventing said signaling current from being again applied to the called line upon the said restoration of the called subscriber's receiver, and means controlled by the operator for applying said alternating current to said connection to actuate means for again applying said first current to said called line before the connection is released."

Interference No. 51,168 was declared between the application, Serial No. 192,713, filed by Friendly September 22, 1917, and an application, Serial No. 155,640, filed by Wicks on March 19, 1917. Of the eleven counts at issue before us in this interference, we quote count 8: "8. In a telephone system, a called telephone line, operator controlled automatic switching mechanism for extending a connection to said line, automatic ringing equipment for signalling the called subscriber upon the completion of the connection, and operator controlled means for predetermining whether or not said ringing equipment will be operated."

Interference No. 53,227 was declared between a patent, No. 1,441,791, granted to Friendly on January 9, 1923, upon an application originally filed June 11, 1917, and twice renewed at different dates, and the application, Serial No. 155,640, filed by Wicks on March 19, 1917. Count 4 of this interference is here quoted: "4. In a telephone system, a calling station, a telephone line involving near and remote sections thereof, a junction point of the sections, a first relay controlled from the remote section and a second relay controlled from the near section together operative to join the sections at the junction point, first and second signaling current sources, said first source being of a character to which a condenser is transparent, the second relay responsive to the first source to apply the said second source to the line and to prepare an operative circuit path controlled by the first relay, means for completing a connection from the calling station to the line, and means for applying the first source over the near section to operate the second relay to apply the second source to the remote section and to prepare the said circuit path controlled by the first relay and the second relay whereby the sections will become joined under control of the remote section and both said relays will become disconnected from operative relation with the connection."

Interference No. 57,619 was declared between an application, Serial No. 346,323, filed by Wicks on December 20, 1919, and

renewed June 2, 1927, and the application, Serial No. 192,713, filed by Friendly on September 22, 1917. Count 1 of this interference is here quoted: "1. In a telephone system, means including a plurality of serially related automatic switches for extending a connection to a called line, a ringing relay in one of said switches for initially ringing the called subscriber, and a ringing relay in another of said switches operable at will for applying ringing current to the line while the receiver is off the hook."

The general subject-matter to which all the counts of all the interferences relate is that of an automatic telephone system. More specifically the counts are for certain claimed improvements in the circuits and switches of such systems.

A detailed technical description would require a number of pages, and, since it does not appear to be necessary to a decision of the issues involved that one be given, we refrain from so doing.

It seems sufficient to state, in nontechnical terms, that in the automatic systems, as used prior to the invention at issue, when what is commonly referred to as a "long distance," or toll, call was made to a place having an automatic or dial system, the connection would be made by the operator at the board, and the telephone of the party called would be rung by the operator manipulating a key, rather than automatically, as in local calls where the dial system is in use. Such invention as was incident to the foregoing, which became involved in these cases, is stated to have been the invention of Wicks, and a number of counts relating to this, originally appearing in some of the interferences at issue, were awarded to Wicks and no appeal was taken by Friendly.

The issues here are limited to an improvement which enabled the operator, by "dialing" the instrument of the called party, to cause an automatic ringing of the bells, or, by manipulating a particular key before dialing, to retain control of the connection and thus control the ringing manually.

In other words, the invention is of a device or feature which renders it possible to have either an automatic ringing of the instrument of a called party (in the case of long distance calls) as a result of dialing by the operator, or a ringing at the will of the operator, operating manually.

The Board of Appeals held that the disclosures of the respective parties read upon the counts at issue. Not all of the subject-matter of all the counts, however, is disclosed in any single patent, nor in any single application. Hence the number of interferences.

Both tribunals of the Patent Office agreed in awarding November 11, 1916, to Friendly as the date of his conception, and December 26, 1916, as the date of his reduction to practice.

In his preliminary statements Wicks claimed conception of the count involved in Interference No. 49,496, on August 11, 1915, with reduction to practice on September 15, 1915. Of certain of the counts in Interference No. 51,168, he claimed conception September 23, 1916, with reduction to practice "middle of December, 1916," and of the others (15 and 16) conception September 23, 1916, with reduction to practice January 8, 1917. Of the counts in Interference No. 53,227, he claimed conception March 25, 1915, with reduction to practice September 1, 1915.

Of the counts in Interference No. 57,619, he claimed conception July 30, 1918, with reduction to practice September 17, 1918. The dates thus claimed in Interference No. 57,619 were subsequent to the filing date (September 22, 1917) of the Friendly application, Serial No. 192,713, with which the Wicks' application became involved.

We do not find in the decisions of the tribunals of the Patent Office where express dates were specifically awarded Wicks for conception of any of the involved counts, but it was held that no date earlier than January 12, 1917, could be awarded to him for reduction to practice of any, and priority was awarded to Friendly in Interference Nos. 49,496, 51,168, and 53,227 as the first to reduce to practice, on the ground that, even were Wicks awarded the dates claimed by him for conception, thus adjudging him the first to conceive, he failed to sustain the burden of establishing diligence.

In Interference No. 57,619 the award was because Wicks' claimed dates were subsequent to Friendly's filing dates, and Wicks failed to show cause why judgment should not be entered against him.

It appears from the record that Wicks, at the time of his work upon the involved invention, was, and for many years previous thereto had been, in the employ of the Automatic Electric Company of Chicago as a development engineer. He was graduated from the University of Minnesota as an electrical engineer in 1904 and shortly thereafter entered the employ of said company; was for a time thereafter engaged with other

electrical concerns; returned to the Automatic Company in 1914 and went to work in the development department, "to keep the development of tool equipment associated with the automatic switchboard abreast with other developments made by the Automatic Electric Company." He was a designer and draftsman of much experience in this field of art. Friendly also is shown to have been skilled in the art. It appears that he graduated in mechanical engineering in 1896; was for some time thereafter employed by the Bell Telephone Company; became superintendent of equipment in installation work; later was with the Northwestern Long Distance Telephone Company; handled "circuit detail" and developed "quite a lot of automatic apparatus, with particular reference to long distance operation"; was for three terms a member of the Telephony and Telegraphy Committee of the American Institute of Electrical Engineers; and was, in 1916, employed by the Indianapolis Telephone Company as an assistant to the president thereof, charged with the duty of passing upon and approving all engineering features in connection with the installation for said Indianapolis Company of an automatic system by the Automatic Electric Company, the employer of Wicks.

The installation work at Indianapolis took place in 1916–17. Wicks was not regularly engaged in this installation work, but was performing his duties for the Automatic Company at its Chicago plant. Friendly was stationed at Indianapolis.

So far as the record discloses, the idea of having a device to perform the functions claimed for the invention here involved originated with Friendly.

Under date of September 20, 1916, Friendly wrote two letters, which are parts of Wicks' Exhibit 13 in the record, to the Automatic Electric Company, the first being supplementary to the second.

In the first he said: "Your later toll connectors are so arranged that, when the toll operator selects one the subscriber must be rung by the toll operator manipulating a key. Will it not be possible to make a slight change that will obviate the operator manipulating the key, that is, the subscriber will be rung as soon as the line is seized."

The second letter says: "Supplementing our letter of even date, in regard to toll service trunks, we would welcome an arrangement whereby our operator could throw a key before dialing and thereby be able to control the ringing, or not throw the key and the ringing be automatic."

This, however, was merely the expression of an idea or the statement of a problem, and there is no insistence upon September 20, 1916, as Friendly's conception date.

The testimony of Wicks is to the effect that, upon receipt of the letters of Friendly, Mr. Campbell (who had died before the testimony in the case was taken), general superintendent of the Automatic Electric Company, took the matter up with him (Wicks), and that he (Wicks) on September 25, 1916, made a sketch which is Wicks' Exhibit 12 of the record. Richardson, another witness, corroborates Wicks as to the existence of this drawing on September 25, 1916, he having signed it that day, and Quayle states that it was exhibited and explained to him "at or about Oct. 1916." This sketch is claimed to be a disclosure by Wicks of the invention.

It is not contended that anything further in the way of developing the claimed invention was done at that time, by Wicks or by his employer, Automatic Electric Company, which, as the assignee of Wicks, is the real party in interest in this interference. This is explained to have been due to the fact that the Automatic Electric Company was averse to complying with Friendly's suggestions, because, in part, of doubt as to it being possible to develop a practicable working device and install it with the other equipment within the time fixed by the terms of the contract for completion of the installation. Wicks testifies that at the time Friendly's letters were brought to his attention he told Mr. Campbell that: " * * * The switches for Indianapolis were already under production and that it would involve considerable change to embody that feature in the switches themselves. * * * "

Wicks further testified, in answer to a question as to whether he recalled disclosing his sketch to any one: "Yes, I disclosed it to some of the engineers that had to do with the installation of Indianapolis exchange, but I cannot recall exactly who it was. Then I disclosed it to Mr. Campbell who advised me that as it was questionable whether or not it would be used at Indianapolis that I drop the matter for the time being and file my sketch down to the Patent Department. I therefore took the sketch down to the Patent Department and explained it to Mr. Fales and to Mr. Richardson of that department."

In the meantime, under date of September 21, 1916, the Automatic Electric Company

had replied to the letter of Friendly, in which reply it was stated: "In regard to the latter part of your letter of September 20th regarding automatic ringing from the toll connector, will answer you in immediate future."

Notwithstanding this promise, and notwithstanding the sketch made by Wicks, Friendly was not again communicated with concerning the matter.

Thereafter, along in the early part of November, Friendly, not having heard from the Automatic Electric Company, began to develop his own idea, and on November 11, 1916, completed a sketch shown as "drawing N–100," on file in the record as Friendly's Exhibit A, which the experts of the Patent Office have held to be operative and to disclose the invention claimed in the counts.

This sketch, or a print thereof, he forwarded to the Automatic Electric Company, together with a written description, and a letter, in which letter, among other things, it was said:

"Following letter of yesterday, find herewith private print N–100, which is the toll trunking circuit that we propose using at Indianapolis; also find typewritten description of the circuit which we believe is self-explanatory. * * *

"We call your attention that should the operator wish to ring back the subscriber, after he has hung up, if he had first been rung automatically, the operator can do so by simply using her regular cord ringing key. * * *

"If you have any suggestions regarding the circuit N–100, feel free to bring them up, as we do not wish to introduce any equipment unless agreeable to you, knowing you are as vitally interested as ourselves. * * * "

Upon receipt of this letter and the papers, Wicks, who is not shown to have theretofore done anything whatsoever concerning the matter, except to make the sketch of September 25, 1916, again turned his attention to it.

His activity seems to have been first directed to providing the necessary mechanism and testing the circuit which Friendly's drawing disclosed. Under date of December 20, 1916, the experimental department of the Automatic Electric Company, in a letter addressed to Mr. E. L. Cline, general manager of the Indianapolis Telephone Company, made a report upon a test of same in which a number of alleged defects were listed, and it was suggested that a plan designed by Wicks

and referred to as "sketch S–289" be substituted. Wicks testifies that he personally wrote this letter to Cline. There does not appear to have been any use made of, or any attention given to, his sketch of September 25, 1916.

The letter does not seem to have been disclosed to Friendly and he was first made aware of Wicks' opposition to the changes which he (Friendly) had proposed, in a conference some time in December, 1916, or January, 1917.

The sketch S–289 is in the record as Exhibit 28, and bears a date of December 12, 1916. Testifying concerning it, Wicks, upon cross-examination, stated, in substance, that it was "prepared to represent the manner in which the Automatic Electric Company would recommend that" the result which had been suggested by Friendly should be obtained.

In the testimony of Wicks, upon cross-examination, the following appears:

"XQ. 239. Was this circuit S289 exhibit 28 designed by you at the time you took up for consideration Mr. Friendly's letter of November 15, 1916, and the description accompanying it forming part of your exhibit No. 13 and Mr. Friendly's sketch N100, exhibit No. 14? A. This question was first submitted to me by Mr. Campbell in September, 1916, and the first suggestion I made for equipment to be used for this purpose was the sketch submitted as exhibit No. 12. The matter was discussed several times after that and the sketch S289 Exhibit No. 28 was prepared to represent the manner in which the Automatic Electric Company would recommend that this work be done. I cannot say for sure whether I had Mr. Friendly's letter at the time I made the sketch, *but I rather think I did so.*" (Italics ours.)

In the further development of the invention, Wicks made other sketches and drawings, the chief one of which seems to have been made on January 8, 1917. This appears in the record as Exhibit No. 18. It is a composite drawing, made up of separate drawings and, apparently, represented the device which was reduced to practice January 12, 1917. There is no claim of any reduction to practice of either S289 or the sketch of September 25, 1916, except as they were embraced in Exhibit 18.

 Counsel for Wicks has very earnestly urged before us that the Board of Appeals erred in finding lack of diligence upon the part of Wicks.

It is argued that the invention relates to a highly complicated art; that it was of greatest importance that the practicability of any device proposed should be fully established before being installed; that the contract with the Indianapolis Company involved an expenditure of about a million dollars; and that changes could not be lightly made in the equipment without endangering its success.

All of this may be admitted. Indeed, it seems obvious, but we are unable to see wherein a consideration of the situation at Indianapolis affects the law of the case, since the work there is not shown to have been any impediment to Wicks proceeding with anything he might have wished to do concerning the invention. It is fairly deducible from the record, which is quite voluminous, that the relations between representatives of the Automatic Electric Company and Friendly became somewhat strained; that the former did not take kindly some of the suggestions of the latter, and there is some intimation in the Wicks' brief as to Friendly's anxiety not fully to disclose some of his ideas because of his desire to assure himself of patent protection.

All of this likewise appears to us to be beside the question which we are called upon here to decide.

Friendly, at least, did not fail to disclose to the Automatic Electric Company either the idea of the invention here involved, nor his conception of a device through which that idea might be made to function. So far as the issue here involved is concerned, Friendly was under no obligation to do it, but he did, and had Wicks, or his assignee, after receiving the Friendly letter of September 20th, pursued the matter, the Wicks' plan of operation might easily have been reduced to practice without the slightest interference on the part of Friendly, prior to the time that Friendly entered the field, even with a claim of conception.

That, after all, no very long period of time was required is evidenced by the fact that after Wicks did turn his serious attention to the matter, following the receipt of Friendly's drawing and description of November 11, 1916, he (Wicks) made drawings within a month which, apparently, embraced the invention, and, within another month, had reduced his own invention to practice, after having first tested out the Friendly plan (not theretofore reduced to practice), and profited by his observation and studies of its alleged defects. However complicated the art,

it remains a fact that the period within which Wicks made sketch S–289 and reduced to practice (December 12, 1916 to January 12, 1917) was just one month. The period between Friendly's first suggestion of the idea and the date of his conception of a device (September 20, 1916 to November 11, 1916) was about seven weeks.

There is not the slightest evidence in the record that Wicks, or his assignee, following the making of his sketch of September 25, 1916, ever gave the matter another serious thought until after the receipt of Friendly's drawing of November 11, 1916.

Wicks, himself, testified:

"Q. 97. Did you continue your work on circuits and equipment for toll service *after* the year 1916? A. Yes sir.

"Q. 98. How soon after? A. I continued to work at that *constantly* off and on during *the latter part* of 1916 and running on to year 1917." (Italics ours.)

Even if we assume this general testimony to relate to the specific invention at issue, it is obviously insufficient to show activity on the part of Wicks immediately prior to November 11, 1916, the date of Friendly's conception.

It is insisted in the Wicks' brief that "Wicks started making apparatus for his reduction to practice before knowledge of Friendly's conception."

The only evidence cited in support of this contention is that where Wicks said: " * * * I remember that when I made a study of the circuit N 100 submitted by Mr. Friendly and I had a sample of the circuit that he submitted made up. I used this switch in making the test [of exhibits 20 or 18 of Wicks' own drawings]. * * *"

Surely this is far from proving, or even saying, that he was making apparatus for a reduction to practice of his own device. This testimony, it seems to us, can only be construed to mean that a switch which he had made for use in testing whatever Friendly had conceived, as expressed in drawing N–100, was later found to be serviceable in his own plan after he had evolved it.

The conclusion seems to us to be irresistible that Wicks and his assignee were spurred into activity by Friendly's disclosure received by them November 15, 1916.

Upon this issue we agree fully with the findings of the Board of Appeals, which were in accord with those of the examiner of interferences.

The facts of this case are so obviously different from the facts of the case of Jones v. Evans, 46 F.(2d) 197, 18 C. C. P. A. 866, cited by Wicks, as to render inapplicable here the rule there applied.

In that case we found that the party who was awarded priority had been *doing something* before the losing party entered the field. Here there is not the slightest evidence that Wicks did anything before November 11, 1916, except to make a sketch which was never thereafter used by him, or his assignee, for any purpose, until introduced as evidence.

It was incumbent upon Wicks, or his assignee, to show diligence, and neither did so. Martocello v. Kobash, 39 F.(2d) 677, 17 C. C. P. A. 1095.

Another contention of Wicks is that: " * * * Friendly does not have the right to make the claims stated in Count 2 of the issue of Interference 49,496, Counts 1, 2, 4 to 8 inclusive, 11, 12, 15 and 16 of Interference 51,168 and Counts 1 to 6 inclusive of Interference 57,619, these being all of the counts of the three interferences referred to that are involved in this appeal. * * * "

Also it is contended that count 4 of Interference No. 53,227 contains limitations which do not read upon Friendly's drawing N–100; that if so construed it will read upon Wicks' drawing of September 25, 1916, thus rendering priority dependent upon Wicks' diligence.

This latter contention is disposed of by our holding upon the question of diligence and need not be further considered, except that it seems proper to say that, in any event, the subject-matter of the count is disclosed in a later drawing of Friendly, dated December 23, 1916, being sketch N–125, and was in the device which Friendly reduced to practice on December 26, 1916. This was prior to the reduction to practice by Wicks of the Wicks' device.

Upon the contention relating to Friendly's right to make the claims which constitute the counts of Interference Nos. 49,496, 51,-168, and 57,619, respectively, we shall not dwell at length. The decisions below contain full technical discussions.

The gravamen of Wicks' argument is that Friendly in his application, Serial No. 192,-713, of September 22, 1917, upon the disclosures in which he must depend for his right to make the counts, did not " * * * describe or illustrate the construction of the connector switch necessary to establish connection with the called party."

This issue was pressed before, and passed upon by, the tribunals of the Patent Office. At the proper time during the proceedings there Friendly moved to add claims corresponding to counts 8 to 16, inclusive, of Interference No. 51,168. Wicks opposed the motion on the ground that Friendly's disclosure did not support the claims. The law examiner denied the motion and denied an application for rehearing. His decision was affirmed by the Board of Examiners in Chief. This was prior to the statute which made the decision of the Board of Appeals final and Friendly appealed to the commissioner. The commissioner (acting through the first assistant commissioner, an expert in the art involved) reversed the decision of the examiners in chief and held that Friendly could make the counts.

There, as here, it was urged that Friendly in his application did not disclose "local and toll selectors and connectors or local and toll connectors," with which his improvement was to co-operate, but merely referred to such structures as "of a well known type."

The assistant commissioner pointed out that the record disclosed the installation at Youngstown, Ohio, about the time of, or prior to, Friendly's conception, of a system which included local and toll connectors "which would readily operate with the system disclosed in Friendly's Figures 11 and 16"; that from Friendly's employment and association with some of the engineers engaged in installing the Youngstown system, it was a fair presumption that Friendly was aware of the system, and said:

"It cannot be deemed logical that an engineer of Friendly's standing would have devised a complicated system such as disclosed in his Figures 11 and 16 and have sought a patent upon it and yet not have known of the existence of some combination local and toll connectors that would operate with the system that he had invented so as to make the latter possess utility. It is fairly to be deduced from his statement that the circuits of his Figures 11 and 16 were to co-operate with well known combination local and toll connectors and that he knew of such connectors. With these rather complicated automatic telephone systems, it is quite customary, and the custom is encouraged by the Patent Office, to limit the illustration and description, so far as practicable, to what is new,

leaving its relation to what is old to be determined by those having knowledge of the art. While it is preferable to supplement a disclosure, where necessary, by a reference to a patent or a publication disclosing that portion of a system, not illustrated or described, which co-operates with what has been invented, yet if such old devices or circuits are not found in a patent or publication, it is believed sufficient to show that they were in commercial use in an installation.

"It is not disputed that the installation at Youngstown disclosed the combination local and toll connectors with which Friendly's new circuits would co-operate and upon which he must have intended such new circuits to be an improvement. Under these conditions, it is believed he should not be denied the right to make these claims. * * * "

In his opinion the assistant commissioner, we think, correctly pointed out the distinction between the case there presented and that of Erickson v. Dunham, Interference No. 38,596, cited and quoted from by the examiners in chief, and quoted from by Wicks in the brief before us.

When Interference Nos. 51,168 and 57,619 were heard finally before the Board of Appeals of the Patent Office, the issue was again raised by Wicks, and the board formally adopted as its decision the prior decision of the assistant commissioner from which we have quoted, supra.

We find no error therein.

In our opinion, the Board of Appeals has correctly determined the issues involved in each of the cases.

Accordingly, the respective decisions of said board in appeals 2895 (Interference No. 49,496), 2896 (Interference No. 51,168), 2897 (Interference No. 53,227), and 2898 (Interference No. 57,619), are affirmed.

Affirmed.